Please, the Court, I would like to reserve five minutes. All right. Watch the clock. I'll try to help you as well. Thank you, Your Honor. I represent Mr. Johnson. My name is Frank Prantill. This case involves a murder of a San Quentin guard as he's walking down a tier while he's walking down a tier where inmates are housed, locked down in single cell occupancy. But the wrong man is convicted and consequently this case is one of an extreme injustice. There was no fair trial here. There was no fair trial because the main witness, the only eyewitness to the murder, told his supervisors, filled out his official report, told the district attorney and his investigator and testified at the preliminary hearing under oath that the murder occurred outside a cell occupied by another inmate. And four years later, he changes his story to say that the murder occurred two cells down, which was occupied by my client. And why does he change that story? Because immediately after he testifies, he gets his job back. The man was living on the street. He had been terminated by the CDC and he testifies at trial four years later to get his job back. There was no fair trial here because the prosecutor was able to parade before the jury evidence of the murder of a Marin County judge, the very same courtroom that this case is tried in. And the jury is told that that evidence is enough to convict them. It's a motive and it was enough standing alone to convict them. There was no fair trial here because the court excluded evidence of third party liability. There was no fair trial here. On the third trial, on the third party liability, though, wasn't that anonymous? I mean, they didn't have, it wasn't developed into an individual or? It wasn't identified, but it was from members of the Crip gang. The officer testified, Officer Kimball testified that he believed it was from a member of the Crips gang. And this was a conspiracy by the Crips gang. Therefore, they all knew about it. And when it came down, they took responsibility for it. So it wasn't just an anonymous note. This was a note from a member of the Crips gang that had information that was part of the conspiracy. And of course, you know, inmates pass kites between cells, between cell blocks. It's a lot of information. They go in the yard, they share information. So this was, this is something the Crips were aware of. They admitted liability and the court kept it out. And it was very probative as the district court found. This wasn't a fair trial here, Your Honor, because the case was built upon snitch testimony. And even the State Court of Appeal recognized that these witnesses were all manipulators and corrupt drug dealers, etc. There was no fair trial here, Your Honor, because the key witness for the prosecution avoided a 16-month prison sentence, avoided a one-year parole violation in exchange for his testimony, and the jury wasn't able to evaluate that fact because the jury was not told about the deal. There was no fair trial here because the court allowed hearsay statements of the co-conspirators without establishing the larger conspiracy here, without establishing, without statements that there was a conspiracy to kill more guards. There wasn't a fair trial here because the court refused the law. I'm a little, are all of these issues separately raised in your brief? Yes, yes, Your Honor. I narrowed it down a little more than this, I guess, but maybe, maybe I lumped some together. I don't know. They're all raised separately, Your Honor. There wasn't a fair trial here because the trial court wouldn't allow the defense attorney to impeach a witness who falsified medical absence reports. The defense attorney was not allowed to go into the probability that this officer who was terminated or who made this false statement might be seeking reinstatement or might be seeking favor so that he can get reinstatement. So that whole area was blocked. So my client's right under the Sixth Amendment was violated. And I believe, Your Honor, I think those are all the issues. Okay. I think you've laid them out pretty well. And if there's any questions the Court might have? I don't know that we have anything specific. You've got an extensive brief and you have a lot of issues. And we certainly in this case, we have the district court's opinion, which is quite extensive, too, that lays out your issues. So that's helpful to us. Let's turn then to the government, if that's all you have. Thank you, Your Honor. May it please the Court, Gerald Engler, representing the warden on behalf of the State of California. Let me just respond real briefly on some things that may be helpful to the Court in terms of what's in the record and what's not in the record, based on counsel's opening remarks. This comment that the officer who was the eyewitness, the gunrail officer, changed his testimony, his inconsistencies were all put before the jury, and that's never been raised as a specific issue. There's no alleged constitutional error regarding Officer Lipton's testimony. There's one thing that appears for the first time on this appeal, in the briefing on this appeal, that I simply want to clear up. I admit that it's been many years since I've read the entire record, but I can't find anywhere in the record where Officer Lipton testified that he got his job back two days after his testimony or where that appears in the record. It's not cited in the briefs. It was never raised as any sort of claim of error in the state court on direct appeal. It was never raised as a claim of error in the district court. So I don't know how that fits in, but it's not any sort of independent claim of constitutional error that's before this court, nor is it one that I can represent in good faith appears in the record of the state trial proceedings in this matter. The other thing, just to clear up the record, one of the facets of the claim going to the admission of the gang testimony and the gang-related testimony, there was the claim made that one of these gang documents contained graphic detail of the Marin County shootout involving the Jackson brothers in the early 70s, which was a famous incident in the history of the BGF. The record shows that the judge specifically excluded that document and all that description. The reason that document came in is because one of the co-conspirators, Masters, had signed the bottom of it with this name, Ascari, which was one of these Swahili names that the state star witness, Willis, said that was the name that Masters used. He used Ascari. That was one of the disputed facts. So here was this signature, Ascari, on the bottom of this document describing the Marin County shootout. The prosecution said, we want to show that Masters really does use this name. We've got a handwriting expert that can say that Ascari is Masters' signature. And the judge says, okay, fine. You can bring in this document that shows Ascari on the bottom of it, but you have to white out everything else. And if you look at the actual exhibit that came in, and I believe, going by memory, it's in the brief I identified, I think it was 318B6. It had about four tails on the end of it. The only document that the jury ever saw is simply a piece of paper that has Ascari. Then you have the expert witness saying, yes, that's the co-defendant's handwriting signing Ascari. And there were many other writings by which he could make that conclusion. The bottom line is the Marin County shootout doesn't get before the jury to show that, you know, I think that's important to make because that argument was made in the brief. It's repeated in the oral argument that somehow this got before the jury. It didn't. Short of that, the arguments are general. I won't respond beyond that unless the Court has questions that the State's prepared to answer. I think by the recitation, you know, he's suggesting, of course, the cumulative error. And I think you responded to that in your brief as well. So I don't think there's any other questions. Thank you. With that, the case is submitted and we're adjourned for this morning. Oh, did you want to? I am sorry, yeah. And you have plenty of time. I got ahead of myself. It was difficult for me to get a record in this case, but I believe the fact that this guard got his job back, that they testified has found a reporter's transcript on page 11368. Thank you. And there was a lot of evidence before the jury that on these black guerrilla family notes that discussed racist things, that discussed killing people, killing judges. I believe it's ‑‑ if I could have a second chair. I believe I cited it in my opening brief. The district court found that the trial court's decision to admit the gang‑related documents are not arbitrary. The gang‑related documents that were admitted were significant to connect Petitioner with the BGF and to demonstrate that BGF members had a clear motive to kill people and that that stood in the way of their cause and that all BGF members were expected to carry out the orders under penalty of death. That sounds like ‑‑ are you referring to some evidentiary motion outside the presence of the jury? Your Honor, I'm not sure if that's true or not. If it was, then I stand corrected. Again, I didn't get the complete record here because it was like 16,000 pages. Right. And I wasn't trial counsel. And I did the best with what I was able to glean from the district court's order and findings. So I ordered what I could from what the district judge ordered. And I believe that this evidence, even though it didn't mention, the judge's death, but it clearly was stuff about black inmates in 1971. Well, maybe not, but in any event, there was still plenty of prejudicial evidence about what this black guerrilla family is all about. My client was supposedly a member of that. And that evidence alone was enough to convict him of murder because of the court's instruction on motive. Motive alone was enough to prove guilt. So when you couple that evidence with the court's instruction, Mr. Johnson could have been convicted just on that evidence alone, and it shouldn't have been admitted. Thank you, Your Honor. Thank you. And now I will timely submit. Johnson v. Canberra, and we'll adjourn. Thank you. All rise.
judges: Wallace, McKeown, Callahan